Our next case today is 2015-1890 ComBea Corporation v. Noguar L.C. Our next case today is 2015-1890 ComBea Corporation v. Noguar L.C. Mr. Gilliland? Yes. Please proceed. Good morning. Imagine if I brought to the podium a device that I attached to the microphone. Then whenever I spoke through the microphone, my voice would come out sounding like that of James Earl Jones. Imagine further that I could push a button on that device and it would start playing a recording of the mellifluous voice of Mr. Jones saying, may it please the court, my name is. Then I would interrupt it and I would interject in my own voice, James Gilliland, and I represent Appellant Noguar. But you would hear those words, but you would hear them coming through in a voice that sounded like James Earl Jones because my voice matching technology, using bandwidth filters and impedance matching, allowed a seamless interleaving of live voice forms and recorded voice forms. I looked through all the claims of the two patents and I didn't see this notion of voice matching that you're leading your argument off with in any of the 387 or 510 claims. What I saw, for example, with the 387, you just gave me your conception of claims. Now I'm going to give you my conception of the 387 claims. These are method claims. What I'm imagining is my grandmother in California living in this big retirement community. Now there's a boiler room, telemarketing boiler room somewhere else in California. Maybe 300 people are sitting there in cubicles. Their assignment is to hit this retirement community hard. Call every single one of those people until they pick up the phone. Then there's a guy in a cubicle that makes contact with my grandmother. He's got 10 tape recorders set up in front of him. Then after my grandmother says hello, he hits the play button on tape recorder number one. Then after he elicits a response from grandma, then the telemarketing agent decides, based on what he's hearing, to hit play for tape recorder number two or number three. And based on what he hears next from grandma, then he can choose whether to hit the play button for tape recorder four, five, or six, and then so on. That's what I heard or read when I looked at claim one of the 387 patent. Well, Your Honor, that sounds more like the Noble patent than the Nogar patents. And I would suggest that if the district court had done a claim-by-claim analysis, as you are suggesting, then it would have found that in the dependent claims there is much more specificity and that if you drill down into the claim language, which is what we are saying that needed to be done, then you will see that the seamless interleaving of live voice. We can talk about the dependent claims, but just to clarify, I didn't see anything in your opposition to the other side's summary judgment motion or any arguments by your side during the hearing, the summary judgment hearing, where your side, the patentee, was arguing for and expressing an interest in having a claim-by-claim analysis or suggesting in any way that the claims that the other side raised as being essentially the representative claims for deciding the case were the wrong claims to be looking at. And then there were other claims that had interesting inventive concepts that were not really captured by the representative claims chosen by the other side. Is that fair to say? It is fair to say that at the district court level there was very little discussion of the claim language itself. And it is also accurate that both sides talked about this at a very high level. But I would submit to the court that it is not the obligation of the patentee to seek a claim-by-claim analysis. That is what the law requires since each claim is presumed valid individually. And unless the parties stipulate to the use of a representative claim, which did not occur here. So there were four patents originally in this case, right? Yes, that's right. And let's say there were 200 claims. 118. 118 for across four patents. So are you saying that in this particular case, Combia needed to write a brief for explaining for each of the 118 claims why each one was invalid under 101, and then the district court judge would have to write an opinion with separate little subsections on all 118 claims? Well, I think that practically speaking, yes. We've seen maybe 20 opinions from this court since Alice, and I haven't seen an opinion that went through all of that. Well, and that's true. I looked at them as well, and I did not find that. But that's usually because the district court did require the parties to select a representative claim or claims. And then that is where the argument proceeded. That did not occur here, which is why we filed our motion for reconsideration, pointing out this issue. Why didn't you point it out the first time? I mean, if your opponent files a motion saying these patents are invalid because they claim an abstract idea X, that has to be read as saying every single claim is based upon abstract idea X. It's certainly their burden to show invalidity, but if they're alleging that there's no genuine dispute, don't you have to then respond and say there may be a genuine dispute as to one or more, or you waive your right if you just respond in general? Well, we did identify in the trial court in response to summary judgment a number of individual claims, and none of those were addressed separately by the court in its decision. There was something in your opposition brief where you described some of the individual claims, but then when it came to actually arguing why any of the claims were patent eligible, then in the argument section what I saw was the patent owner just arguing them all together in a single basket under a single theory. Well, as I said, I concede that there was not a deep drill down into the claim analysis. Why does the content extraction kind of decide this particular issue in the sense that there were a couple of claims that were chosen as the representative claims to evaluate the validity of all the claims, and the district court ultimately found those chosen claims to be invalid, and then the patent owner argued that, well, there needed to be a claim-by-claim validity analysis, and this court issued an opinion saying, well, that could have been raised below. There was an opportunity to address that by the patent owner requiring the district court to identify and explain why each and every claim was invalid, but the patent owner never brought that up. The opportunity was there. So in this instance, Your Honor, what happened was that the patent owner relied on the presumption of validity for each claim, and we did identify individual claims in the first round of briefing, but then when we saw that there was no claim-by-claim analysis, we filed our motion for reconsideration, and we specifically asked for the district court to rehear this issue so that we could select representative claims so that we could drill down into the claim language, but the court denied that, saying that it was not obligated to do that. Tell me why it wasn't harmless error for the district court to do that. Point me to a dependent claim in the 510 patent, for example, that you think if that had been analyzed separately, it had the following elements, which clearly, for example, demonstrate and claim the voice-synthesizing technology I opened my argument with, or something like that. Show me why it isn't harmless error, what you're complaining about, and tell me, what claim would you like me to look at? I'll look at any claim you'd like me to look at. Go ahead. For the voice-synthesizing technology, I'd ask the court to look at the 387 patent. Okay. And I would ask that we remember that the district court was supposed to look at the claims as informed by the specification. So I'm going to start with the abstract of the 387, which says... No, I don't want to start with the abstract. I want you to give me a claim. Your complaint is that the district court failed to separately analyze dependent claims, and even if I think you're right about it, you have to demonstrate it wasn't harmless error in this case for him to have treated them all as representative. So which claim? Claim 18. Claim 18, which is the method of claim 16, that one in the 387? Yes. The method of claim 16 wherein deciding on intervention further comprised providing a live voice response. Okay, so that's not the voice synthesis that you referred to, providing a live voice response. Right, but it relates back to claim 1. It relates back to 16. Which relates back to... Further leaving, further comprises deciding on intervention, that also is not the voice synthesis. And now let's go back to claim 1 because it's dependent to 16 and now to 1. And claim 1 refers specifically to the interaction protocol. But claim 1, is that one of the ones that the district court considered? It is. Well, the district court never identified any specific claims, but I'm presuming that they started with claim 1. But claim 1 refers to an internet protocol, which is not a defined term, but it is shown... You mean interaction protocol? Excuse me. Yes, Your Honor. Interaction protocol, which is defined in column 3, line 6 through 18 of the 387. And it says, quote, The integration module allows the execution of an interaction protocol by a human agent. The interaction protocol allows the agent to select and present content to a contact in a selected voice type. And the integration module may include a mode module to allow a single agent to select between one of live voice, script, and interjection interaction between the agent and the contact. The hardware and software make it difficult for an untrained ear to tell the difference between the prerecorded script and the live voice of the telemarketer. That's the integration module implementing the interaction protocol, which is described in claim 1. And then if you follow that through to claim 18, it talks about switching back and forth between live voice and recorded voice. But I don't understand. That is just trying to seamlessly intersperse live voice and prerecorded voice. But maybe I misunderstood your opening statement to be that this critical and important contribution that this patent made to the technology was voice synthesis. And you said, imagine James Earl Jones's voice is saying my words. So I guess I thought it was like, Luke, I am your father. I was kind of envisioning, you know, you're saying words, but the sound is not your voice. It's James Earl Jones's voice. I must have misunderstood. The way that this patent works is over a telephone. If I were to have my voice live and a recorded voice from somebody else who is in a deep register, it cannot be a woman's voice, but in a deep register, the recorded voice of someone else and my live voice, and I could play either of them. And because of the impedance matching, and the specifics are set out in columns 7 and 8, but because of the bandwidth filtering and the impedance matching, you would hear a voice that sounds the same, whether it came from me live or whether it came from the recording. And that's in the interaction protocol. It's also in figure 2. If you look at it graphically at figure 2, which is... So this is the important technology is a voice synthesis technology that basically... I mean, I agree with you. I see right in column 3 at line 17 where it says the differences between the prerecorded script and the live voice of the telemarker make it difficult for the untrained ear to tell the differences. So if what's really critical about this invention, if one of the things it really added was the ability to synthesize the live voice and the prerecorded voice so that they sound identical, pitch, cadence, everything else, if that's the contribution, where is that described in this patent? I mean, I'm an electrical engineer, but that doesn't mean I have any vast knowledge of electrical engineering, although 2005 or 2001 is a little more in my ballpark than modern day. But nonetheless, I don't see software or circuit diagram or anything significant that discloses the technology that would achieve what you're saying is the invention right now. So I would suggest that that technology, how the bandwidth filters, the impedance matching is all laid out in column 7 and 8. The diagram in figure 2 shows the voice module, the sales agent in the boiler room speaking through a microphone, linked up to the impedance matching device and the signal processor from the sound card where they are intersecting and being controlled by that interaction protocol in the integration module. So obviously we're having a deep dive now into the claim language, which did not occur, and that's what we're suggesting should have occurred before the court just tossed out this patent. Did your side ask for a Markman hearing on this question of the meaning of integration module? There was no Markman, there was no claim construction, there was no discovery. Did you ever argue that this is the meaning of interaction module? We cited these sections of the 387 patent, but those particular words, interaction protocol, were not spoken. For example, in the paragraph, the sentence above the paragraph you're quoting from says, for example, the telemarketer may be a female with a low voice, and she would select a script that has been pre-recorded in a low-speaking female's voice. Yes. So there are limits to what the technology can do. That's not necessarily some kind of whiz-bang technical impedance matching synthesis of the speaker's voice with some pre-recorded voice. That's more like just generically trying to find, of all the pre-recorded scripts, somebody's voice that's kind of like the agent's voice. No, no. Well, respectfully, I disagree with Your Honor on this. I mean, yes, it cannot normalize between my voice and a soprano voice, and you would choose the alto version if you were a woman with a lower voice, but it can, as within that bandwidth, it can make the voices sound the same over a telephone so that I can selectively interleave human and live voice, which is ultimately the outcome of this invention. It achieves something that was otherwise humanly impossible. It allows the perfect delivery of the scripts and the seamless interleaving of live. We've used all your time, including your rebuttal time. No, it's okay. We had a lot of questions for you, but I think we need to hear from Mr. Bateman now, please. Thank you, Your Honor. Thank you, Your Honors. The court is presented with two different standards of review. The grant of summary judgment is reviewed de novo. The denial of the motion for reconsideration is treated under the abuse of discretion standard. This court has made very clear, well, the Supreme Court and this court has made clear over the last couple of years that there's two types of computer patents. There's patents that actually improve the functioning of the computer, whether it be a new database structure that does something different or whether it's the creation of a hybridized website that accomplishes a goal. And then there's patents where the computer just does what's been done before, only it does it more efficiently. Yeah, but what he's arguing, as I understand him right now, and so I'd like you to address it, is that the interaction protocol in Claim 1 of the 387 patent was this impedance matching that's described in Column 3 and then further described in Column 7. And that sounds awfully technical and specific. I mean, you know, the ability to modulate a voice so that this isn't just listening, receiving a call and then hitting one button versus a different button based on how you think the best response should be. This patent is allowing you to spend part of the time talking, then spend part of the time with prerecorded voice. And what does seem to be technical and might be that something extra that takes it in Alice Step 2 beyond an abstract idea, that something technical, something extra, is it describes in Column 7 an impedance matching protocol that will modulate the two voices so that the user thinks throughout the entire time period it's a single voice that he or she is hearing. So why isn't that the something extra? That sounds like something extra. That definitely sounds something interesting that takes it outside the bounds of just an abstract idea, that ability to modulate the prerecorded voice and the live voice. And if that were actually in the claim, Your Honor, we would have a little different discussion here. Why isn't it? Because he's talking, he's reading about a module within the system that can do various things, but if you look at the steps, it's simply executing an interaction protocol to create an interaction with the contact. You're just creating a contact with somebody. You're picking up the phone, you're dialing the phone, hello, Mrs. Smith. That's all it leaves it at. Nowhere in there does it say, oh, using this to make it seamless or dynamic or any of those. And none of this was argued before the court on the summary judgment motion. Their argument before the court on the summary judgment motion was, we've accomplished what nobody has before because we use interjections. We have recorded yes, no, uh-huh, ha-ha-ha, and I'm sorry, could you repeat that? That was the genius of the invention. That was the argument before the court. We argued before the court 11 times in our briefing. There is no technology here. The claims are devoid of any technological result. They don't claim technology. 11 times in our briefing, NOGOR did not respond. They saw the DDR decision and they argued DDR to the district court. Not once during that discussion did they say, we have anything in our patents that lets us do this seamlessly, that lets us do this dynamically, that lets us do this naturally, that lets us do it transparently. Those arguments weren't made. Four months after summary judgment is granted, they come up with a new idea. We should respond to Kambia's arguments. And they raise them in a motion for reconsideration. Under 10th Circuit law, a motion for reconsideration cannot be used to raise arguments that could or should have been raised before the district court. It may only be used for a clear error of law or where there is newly discovered evidence. If they newly discovered that they have a technology, there's a problem. Because you're supposed to know that when you prosecute the patent, what your technology is, and you're supposed to claim it. And these claims don't address that. They're now trying to conflate a module that can be programmed to do various things with a simple step of initiating a call. You're going through a process. Give me the next call. The computer goes out, pulls in the next call, and you conduct it. That's what the claims say. And they didn't argue that. They didn't ask for a Markman hearing. They didn't make the argument. And Judge Stewart heard the argument. And he said, you know, I've looked at every one of these claims individually. I've looked at them collectively. And there's just nothing more here. Which is exactly the argument that we had made repeatedly as we addressed the court. There's no technology here. They're not claiming anything. Let's make sure I understand your argument, which I think I do. Your argument is twofold. Number one, whatever argument I raised with you and that he raised with me is not the one that was raised below. Yes. But even if it were, you're saying none of these claims actually cover this voice synthesis concept that will merge seamlessly a pre-recorded voice with a human voice despite the cadence and despite one might be a boy and one might be a girl, whatever. None of the claims, even though the patent does disclose it in column seven, but you're saying they didn't claim everything they disclosed. Exactly. And when we kept saying they don't have technology, you would have expected them, if they understood this at the time, to say, oh, no, we do this, we do this, we do this. They didn't respond. Their only response was they just repeated what the claim said and said, yeah, but we use voice actors. And then with their claim 18, deciding on interjections, we can do these things. Their advance, the whole argument they made to the district court was, we have interjections. We've recorded yes, no, uh-huh, I'm sorry, can you repeat that? Well, that's not a technological advance. That's simply recording what a telemarketer says in every phone call. Uh-huh, oh, yes, that's great, Mrs. Smith. Yeah, eight grandkids, that's amazing. Those type of interjections, they recorded them. That was their argument. And then in the motion for reconsideration, they tried to change the argument. They have arguments there, and we could have addressed those arguments had they been raised, but it's just not in the claims. There's nothing there, and we argued that over and over, and that's exactly what Judge Stewart found. He looked at the claims and said, everything in these claims are just the steps of traditional marketing. When you decide on intervening, do I use my script, or did she give me a really weird response that doesn't really match my script, so I'll do something to guide her back to the script. That can be an interjection or it can be an ad-libbed response. This is just everyday telemarketing that goes on millions and millions and millions of times a day, whether it be Judge Chen's grandmother or whether it be my wife, whether it be me in the middle of a meeting, I get a call on my cell phone and it's another telemarketer. The steps that they identify here are literally the steps of telemarketing applied through a computer. This is far less technical than mediating risk, as in Bilski, or intermediated settlement in Alice. This is not even automating the entire process. This is using a computer to automate certain things, and the only thing they automated was interjections. That's it. That's the substance. Okay, Mr. Bickman, we have your argument. Thank you. If you feel like you have to add anything else, you're good. No, Your Honor, we're good. Thank you. Don't get penalized for giving back time. Mr. Gilliland, we'll give you two minutes of rebuttal time. Thank you, Your Honor. It seems like Mr. Bateman is right. I don't see the impedance limitation anywhere in the claims. You may have disclosed, and this happens a lot, and it's very frustrating to me. I read a lot of patents where it feels like there is an invention disclosed in the specification that absolutely could have been claimed and avoided Alice problems, but not as claimed because everybody wants the biggest, broadest claims, and nobody drills down any more on the dependent claims to take it to the level of detail. So why is he not correct that that limitation is not claimed in this patent? Well, Your Honor, I believe that it is claimed through the use of the word interaction protocol and that we need to No, but it doesn't just say it includes an interaction protocol. It is a method claim. This method is executed in order, initiating a call, allowing an agent to selectively interleave during the call. We often say that method steps sometimes have to be performed in the order presented, sometimes do not. And what we look at, and you've made no argument that these don't have to be performed in order, and it would make no sense. This claim clearly is meant to be performed in order, providing a system for interaction, executing an interaction protocol to create an interaction, initiating the call, allowing an agent to selectively interweave recorded scripts. So the interaction protocol in this claim is only being used to execute and create the interaction with the contact. It may be that the interaction protocol is capable of doing a lot more at different times, but the way those words are used in this claim, in order, in sequence, is only the interaction protocol to create the interaction, to establish the communication. So you may be right that the interaction protocol, as described in the spec, is capable of doing a lot more, but not in this claim. What am I missing? Lawyer, I think that this is a decision that needs to be made based upon a record, based upon the file history, based upon, for example, the Noble and Megasi patents that were cited. They had a lot of that same technology, yet this patent was issued over those. They were specifically cited back to the patent office. So there is a bigger, broader record about how to interpret these claims, which is what the district court needed to do. That's all we're asking is for the opportunity to present this argument to the district court in the first instance, because we submit a proper reading of these claims, does say that interaction protocol means specifically not just picking up the phone and calling somebody, but utilizing this technology, which allows the seamless interleaving of voice and recorded. And I will just say that this is a technological problem. You know, when you pick up the phone and there's that one second click, and you know on the other end that you're being referred to a call center, so you immediately hang up. Well, there's an abstract idea, like in DDR and Bascom, of keeping the person on the line, but it's a technological problem. Here there was a technological problem created by the use of the recorded scripts, and that is that when people knew that they were talking to a computer, they'd hang up. There's no compunction about talking to a computer. It was a problem caused by the technology. This is a solution that allows live and recorded to occur simultaneously to solve a technological problem. Okay, Mr. Galland. I've used up all my time. Thank you so much. I thank both counsel for their argument.  Thank you very much.